J-A03041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.N., FATHER | : | No. 2077 EDA 2021 |

Appeal from the Order Entered September 14, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001201-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.N., FATHER | : | No. 2078 EDA 2021 |

Appeal from the Decree Entered September 14, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000572-2019

BEFORE:    STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED MARCH 14, 2022**

L.N. (Father) appeals from the orders entered in the Philadelphia County

Court of Common Pleas, which:   (1) involuntarily terminated his parental

rights to his child, A.M. (Child), born in May of 2012; and (2) changed the

permanency goal to adoption.[1]   Father's attorney, Harry Levin, Esquire

---

[1] The termination order was entered at trial docket CP-51-AP-0000572-2019, and the goal change order at CP-51-DP-0001201-2017.  Thus, **Walker** is not implicated.  **See Commonwealth v. Walker**, 185 A.3d 969, 971 (Pa. 2018) ("[W]here a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case."), *overruled in part*,
*(Footnote Continued Next Page)*

(Counsel), has filed an **Anders** brief and petition to withdraw from representation, averring Father's appeal is frivolous.[2] We affirm the orders and grant Counsel's petition to withdraw.

## I. Procedural History

As stated above, Child was born in May of 2012. The trial court summarized:

> On April 25, 2017[, when Child was almost five years old,] DHS received a General Protective Services report alleging concerns for Mother's mental health and arson. [N.T., 9/14/21, at 10.] Child was adjudicated dependent on May 25, 2017 based on present inability. . . . Child was removed from Mother's care

---

**Commonwealth v. Young**, 265 A.3d 462, ___, 2021 WL 6062566, *1 (Pa. Dec. 22, 2021) (reaffirming that Pa.R.A.P. 341 requires separate notices of appeal when single order resolves issues under more than one docket, but holding Pa.R.A.P. 902 permits appellate court to consider appellant's request to remediate error when notice of appeal is timely filed). In any event, Father properly filed separate notices of appeal for each order. This Court *sua sponte* consolidated the two appeals on October 27, 2021.

On September 14, 2021, the trial court also terminated the parental rights of Child's mother, L.G. (Mother). According to the trial court, Mother did not appeal. Trial Ct. Op., 11/2/21, at 1 n.1.

Finally, we note Child's guardian *ad litem* (GAL) has filed an appellee's brief. The Philadelphia Department of Human Services (DHS), however, has filed a letter with this Court, stating it would not file a brief.

[2] **See Anders v. California**, 386 U.S. 738 (1967); **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). The **Anders**/**Santiago** procedures, for attorneys seeking to withdraw from representation on appeal, have been extended to both termination of parental rights and goal change proceedings. **In re J.D.H.**, 171 A.3d 903, 905-06 (Pa. Super. 2017). **See also id.** at 906 ("Parents have a right to counsel at every stage of a dependency proceeding.").

and placed in Foster Care[, and] has remained in care consistently since this time. [***Id.*** at 13.]

Prior to the adjudication, Father was not involved in the Child's life. [N.T. at 10.] Throughout the life of this case, Father's single case plan objectives have remained the same[:] maintain stable housing, visit with the Child consistently, and report to the Clinical Evaluation Unit ("CEU") for a forthwith drug screen, dual diagnosis assessment [for mental health and drug use,] and three random screens. [***Id.*** at 19; Order 5/25/17 at 2.]

Trial Ct. Op. at 1-2 (some record citations omitted).

Two years and two months after Child's dependency adjudication, on August 1, 2019, DHS filed the underlying petitions for a goal change to adoption and the termination of both parents' parental rights. The trial court conducted a hearing on September 14, 2019. At that time, Child was 10 years old and in fourth grade, and was represented by a guardian *ad litem*. N.T. at 15, 28. Father appeared and testified, but Mother did not appear.

A Community Umbrella Agency (CUA) case manager, Macy Johnston, testified that "throughout the life of the case," Father "would often go long periods of time without visiting the Child." Trial Ct. Op. at 2, *citing* N.T. at 22. He had one visit with Child in September of 2020, two visits in March of 2021, and none since then. ***Id.*** Ms. Johnston further testified to the following:

Father completed his forthwith [drug] screen, but never completed a drug and alcohol assessment. [N.T. at 22-23. A]lthough Father's home in Philadelphia was appropriate, [Ms. Johnston "had not assessed the home since 'the early years of the case.'" He] often traveled back and forth between Philadelphia and New Jersey for work, where he also lives part time. [***Id.*** at 23, 39.] Father had disclosed that he planned to bring the Child back and forth on the road with him when he worked, should they be reunified. [***Id.*** at 24. Ms. Johnston] also testified that Father

has not met any of Child's medical or educational needs over the past four years and is no closer to reunifying with the Child than he was when the case began four years ago. [*Id.* at 25, 28.]

. . . Child has been in the current Foster Mother's home for over four years and . . . they share a mother-daughter bond. [N.T. at 25-26.] Foster Mother meets all of Child's general, medical, and educational needs. [*Id.* at 26.] Child refers to the Foster Mother as "Mom" and has indicated that she wishes to be adopted. [*Id.* at 27. I]t would not cause any irreparable harm to the Child to change the permanency goal to adoption and to terminate Mother and Father's parental rights. [*Id.*]

Trial Ct. Op. at 2-3 & n.2 (some record citations omitted).

DHS also called Roya Paller, a forensic social worker to testify. Ms. Paller was retained by DHS to assess Child in the foster home and determine Child's understanding about adoption.

Ms. Paller visited the Child in the home on January 30, 2021. She testified that the Child is happy in her pre-adoptive foster home and that she wants to be adopted and stay in that home forever. She also testified that the Child wants to sever her relationship with Mother and Father. Ms. Paller testified that the Child does not enjoy visits with Father and finds them "very scary" and therefore no longer wants to visit with Father. [N.T. at 51-52.]

Trial Ct. Op. at 3 (some record citations omitted).

Father testified to the following: (1) he attended "about a hundred" visits, which were "documented;" (2) the visits were "[r]ecorded" and "[v]ideoed [sic];" and (3) he and Child "had a good time." N.T. at 53. Father stated he was recently hospitalized for two or three months for COVID-19, which prevented him from attending visits with Child. *Id.* at 54. Furthermore, he was incarcerated in New Jersey from November 2017 to June 2018. *Id.* at 55.

Father maintained he "completed everything that was court ordered." N.T. at 53. He denied that he was ordered to complete dual diagnoses or any mental health treatment, and instead, he was only directed to submit to random urine testing, which he did. *Id.* On cross-examination, DHS's counsel asked Father if he were present at the last hearing, where the trial court ordered him to complete "a dual diagnosis, drug and alcohol, and mental health assessment." *Id.* at 56. Father first responded that he did not recall if he were present, and then that "the last hearing was postponed." *Id.* at 57. We note that in closing argument, DHS argued Father did attend "the last several hearings" where the court had "ordered him to go for a dual diagnosis assessment." *Id.* at 59.

Next, Father denied that he was "on the road" for work, and stated he owned a production company, which "work[s] out of New York."[3] *Id.* at 54. He then stated, without further explanation, "I'm from New York. And me relocating I was without employment for three years because of this [sic]." *Id.* Nevertheless, Father also stated he has "kept a home in Philadelphia . . . for over four years." *Id.* at 55. He "reached out to Ms. Johnston numerous times via text messages" about evaluating his home, but she did not respond. *Id.*

---

[3] Father stated that his production company "film[s] for VH1." N.T. at 54.

The trial court changed the permanency goal to adoption and terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). The court also found termination will best serve Child's developmental, physical, and emotional needs and welfare, pursuant to 23 Pa.C.S. § 2511(b). Appellant filed a timely appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2).

## II. *Anders* Petition to Withdraw & Brief

"Before reaching the merits of [Father's] appeal, we must first address the propriety of [C]ounsel's petition to withdraw and *Anders* brief." *See In re J.D.H.*, 171 A.3d at 905. This Court has explained:

> To withdraw pursuant to *Anders*, counsel must:
>
> > 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."
>
> Additionally, an *Anders* brief must comply with the following requirements:
>
> > (1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

*In re J.D.H.*, 171 A.3d at 907 (some citations omitted). If this Court "is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004).

Here, Counsel's one-page petition to withdraw does **not** state, as required, that he made a conscientious examination of the record, nor that he has determined the appeal would be frivolous. *See In re J.D.H.*, 171 A.3d at 907. Instead, the petition merely states, in pertinent part:

In accordance with the mandate of [*Santiago*, 602 A.2d 159,] counsel is sending Father . . . a copy of the filed *Anders* brief, this petition to withdraw, and is so informing [Father] of his right to proceed *pro se* or hire a new attorney.

Counsel's Petition to Withdraw Appearance of Counsel, 11/19/21.

However, this Court has stated,

*Anders* is not a hyper-technical process. Rather, it is a procedure designed specifically to afford the appellant specific constitutional rights.

- 7 -

By following the **Anders** procedure correctly, . . . counsel not only affords the appellant the . . . constitutional rights [to counsel] but also demonstrates to this Court that those rights have, in fact, been afforded. . . .

\* \* \*

["W]hile counsel's finding of frivolousness is subject to our review, the **Anders** brief, as well as the **Anders** petition, gives this Court and the appellant an assurance that an officer of the court — a trained attorney — has applied a lawyer's learning and expertise when examining the case on the appellant's behalf." Ultimately, then, **Anders** does not involve a pointless formalism but, instead, a fruitful protocol, adherence to which not only facilitates an appellant's exercise of constitutional rights but also allows counsel to prove to this Court the appellant has been afforded those rights.

**Commonwealth v. Woods**, 939 A.2d 896, 898-99 (Pa. Super. 2007) (citations omitted).

Here, we note Counsel attached, to his petition to withdraw, a copy of the letter he sent to Father, which advised: (1) Counsel was requesting to withdraw as counsel; (2) Counsel was attaching a copy of the brief prepared in support of his request to withdraw; and (3) Father had the right to retain new counsel or proceed *pro se* and raise any additional claims worthy of consideration. Counsel's Letter to Father, 11/18/21. Furthermore, we note Counsel's **Anders** brief includes a section entitled, "Summary of Statement in Support of Withdrawal of Counsel." **Anders** Brief at 11. This section states,

> **The record does not support the conclusion that [Father] has filed a meritorious appeal. Counsel has investigated the record** and identified the issues that may be raised in this appeal . . . .

In this brief counsel has provided a procedural history of the case, and the facts solicited at the goal change/termination hearing, referred to anything in the record that counsel believes arguably supports the appeal, sets forth **counsel's conclusion that the appeal is frivolous** and has stated the reasons for reaching that conclusion. Therefore, this [*Anders*] brief should be accepted and counsel should be permitted to withdraw.

*Id.* (emphases added).

Although Counsel's **petition** does not state that he made a conscientious examination of the record and has determined Father's appeal would be frivolous, his *Anders* brief clearly sets forth these statements. *See In re J.D.H.*, 171 A.3d at 907; *Anders* Brief at 11. The petition does state that Counsel provided a copy of the *Anders* brief to Father, and informed him of his right to proceed *pro se* or hire a new attorney. As Counsel has satisfied to this panel that he has examined the case on Father's behalf and afforded Father his right to counsel, we conclude the petition is minimally compliant with the *Anders* procedure.[4] *See In re J.D.H.*, 171 A.3d at 907; *Woods*, 939 A.2d at 899. We do remind Attorney Levin of the requirements of a petition to withdraw. *See In re J.D.H.*, 171 A.3d at 907.

Furthermore, we conclude Counsel's *Anders* brief complies with the *Santiago* requirements. *See In re J.D.H.*, 171 A.3d at 907. The brief: (1) sets forth a summary of the facts and procedural history of this dependency

---

[4] Furthermore, we note that if we were to find Counsel's petition deficient, we would deny the petition and remand for Counsel to either comply with *Anders* or file an advocate's brief. *See Woods*, 939 A.2d at 898.

- 9 -

matter, with citations to the record and termination hearing transcript; (2) refers to anything in the record that could arguably support the appeal; and (3) sets forth Counsel's conclusion that, and reasons why, the appeal is frivolous. *See id.* Pertinently, Counsel suggests that Father's claims — that he has completed all his objectives and has a strong bond with Child — are not supported by the record evidence. Instead, Counsel states, Father has refused throughout the case to participate in drug and alcohol therapy, mental health services, single case plan meetings, or court hearings. *Anders* Brief at 14-15.

Thus, we now independently examine the record to determine whether this appeal is wholly frivolous. *See In re S.M.B.*, 856 A.2d at 1237.

### III.  Termination of Parental Rights

We first note the claims set forth in Counsel's *Anders* brief:

1.   Whether the trial court committed reversible error, when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the adoption act, 23 PA.C.S.A. § 2511 (a)(1), and (2), (5) and (8).

2.   Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the adoption act, 23 PA.C.S.A. § 2511(b).

3.   Whether the trial court erred because the evidence was overwhelming and undisputed that [F]ather demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with [his] child.

*Anders* Brief at 6.

Our standard of review of dependency matters is broad. ***In re M.P.***, 204 A.3d 976, 985 (Pa. Super. 2019) (citation omitted). However, we do not

> nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

***Id.*** (citation omitted). Moreover, we have stated:

> It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

***Interest of D.P.***, 972 A.2d 1221, 1225 (Pa. Super. 2009) (citation omitted).

We also note the standard of review of an order terminating parental

rights:

> [O]ur scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of

parental rights. ***See*** 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court

- 11 -

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (citations omitted). We need only agree with the court as to any one subsection of 2511(a), in addition to subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the trial court found grounds for termination of Father's parental rights under Subsections 2511(a)(1), (2), (5), and (8). We first observe that Subsections (a)(5) and (8) include the removal of the child "from the care of the parent" for at least, respectively, six months and 12 months. *See* 23 Pa.C.S. § 2511(a)(5), (8). Because the evidence did not show Child was ever in Father's care, we conclude termination under those subsections was mistaken. *See id.*

Nevertheless, we consider the statutory grounds for termination under Subsection (a)(2):

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

At the termination hearing, Father and CUA case manager, Ms. Johnston, gave generally conflicting testimony. Whereas Father testified he visited Child approximately 100 times, Ms. Johnston stated that "throughout the life of the case," "there [were] long periods where he would go without visiting," and that Father's most recent three visits, as of September 14, 2021, were in September of 2020 and March of 2021. N.T. at 20, 22, 53. We acknowledge Father's testimony that beginning in November 2017, he was incarcerated for a seven month-period, and that, shortly before the termination hearing, he was hospitalized for COVID-19 for "over two to three

months." N.T. at 54-55. However, any inability to visit Child during these periods does not explain the other "long periods," "throughout the life of the case," of no visitation. *See id.* at 20, 22. In any event, there was no evidence that Father attempted to maintain contact with Child during his incarceration or hospitalization. This Court has stated:

> Incarceration alone is not sufficient to support termination under any subsection, but "incarceration will certainly impact a parent's capability of performing parental duties, and may render a parent incapable of performing parental duties under subsection (a)(2)."
>
> . . . [Nevertheless, "p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." Rather, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." Importantly, a parent's "recent efforts to straighten out [her] life" upon release from incarceration does not require that a court "indefinitely postpone adoption."

*See Int. of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (citations omitted).

Furthermore, we note that despite DHS' evidence as to Father's goals throughout this dependency matter, Father denied that he was ever directed to complete "dual diagnosis," and instead, he "completed everything that was . . . ordered." *Id.* at 19, 53. Finally, whereas Ms. Johnston testified that Father frequently traveled to New Jersey for work, Father denied such travel, but instead stated, somewhat confusingly, that he owned a production company that "work[s] out of New York," but he "relocate[ed] without employment for three years because of this [sic]." *Id.* at 23-24, 54. In any

event, Father did not refute Ms. Johnston's testimony that he had stated an intention to take Child, then 10 years old, "back and forth on the road with him." *See id.* at 24. Finally, Ms. Johnston believed that Father was not "in a substantially closer place to reunifying with [Child than] he was four years" earlier. *Id.* at 25.

In light of the foregoing evidence, a challenge to the grounds for termination under Subsection 2511(a)(2) would go to the weight of the testimony presented. Here, the trial court found Ms. Johnston's testimony credible, as evidenced by the findings set forth in its opinion:

> Applying *M.E.P.* and the elements set forth under 2511(a)(2) to the instant case, DHS met its burden of demonstrating that termination was proper. The evidence established . . . "incapacity" and "refusal" under 2511(a)(2)[,] given that Father failed to demonstrate a concrete desire or ability to care for the Child. Father has failed to complete his single case plan objectives throughout the life of this case. [N.T. at 22-23.] Despite having had four years to do so, Father has failed to participate in his court-ordered drug screens and assessments. [*Id.*]
>
> Additionally, although Father has a home in Philadelphia, his work schedule requires him to travel back and forth in and out of state and Father has no stable plan to parent Child during this time. [N.T. at 24.] Moreover, the evidence established that "neglect" existed given that Father has failed to consistently visit with Child throughout the life of the case. [*Id.* at 22-23.] Father has only visited three times in the past year, and the testimony established that Father has frequently gone long periods of time without visiting the Child throughout the past four years. This Court found that Father's failure to comply with his single case plan objectives and consistently visit . . . has left the Child without essential parental care, and the cause of such neglect, refusal, and continued incapacity will not be remedied by Father. . . .

Trial Ct. Op. at 8-9 (paragraph break added and some record citations omitted).

To the extent Father's testimony, about his visitation and compliance with plan objectives, conflicted, we do not disturb to the trial court's credibility findings. *See In re M.P.*, 204 A.3d at 985; *Interest of D.P.*, 972 A.2d at 1225. The record supports the court's findings, and thus we do not disturb the termination order as to Subsection 2511(a)(2). Furthermore, we need not assess the termination under Subsection (a)(1). *See In re B.L.W.*, 843 A.2d at 384.

Next, we review the termination of Father's parental rights under Subsection 2511(b).

> "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. Ultimately, the concern is the needs and welfare of a child.
>
> We have explained:
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child — the love, comfort, security, and closeness— entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial.

- 16 -

> The court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment."

*In re M.P.*, 204 A.3d at 983-84 (citations omitted).

Here, Father testified, that his approximately 100 visits with Child were recorded and videotaped, and that the visits went "[v]ery well." N.T. at 53. However, as stated above, Ms. Johnston testified that throughout this dependency matter, there were "long periods where [Father] would go without visiting." *Id.* at 22. Pertinently, forensic social worker, Ms. Paller, testified as to what Child told her: that Child would like to end visits with Father, as the visits are "very scary" and "[s]he doesn't enjoy them." *Id.* at 51-52. Child also understood that "adoption is a forever home," and "definitely wants to be adopted." *Id.* at 50.

Again, the conflicts in the testimony were for the trial court to weigh, and we do not disturb its credibility findings on appeal. *See In re M.P.*, 204 A.3d at 985; *Interest of D.P.*, 972 A.2d at 1225. In the year before the termination hearing, Father visited Child three times, the last of which was six months before the hearing. *See* N.T. at 19-20. At the age of nine, Child expressed to Ms. Paller that visits with Father were "very scary," she wished for the visits to stop, and she wished to be adopted. *See id.* at 50-52.

Finally, the trial court found:

> There was compelling testimony that the Child would not suffer [emotional] harm if Father's parental rights were terminated and that Child was significant bonded with her foster mother. [N.T. at 27, 50.] Father failed to offer any evidence establishing the existence of a parent-child bond. The testimony demonstrated that Child's primary bond is with her foster-mother[, and] that Child's foster mother meets all her general and developmental needs. [**Id.** at 26.] Moreover, the Child is afraid of Father and no longer wishes to have a relationship with him. [**Id.** at 51-52.] In determining that termination would best serve the needs and welfare of the Child, this Court considered that Father has not been able to meet the Child's emotional, physical, and developmental needs for almost three years prior to the termination hearing. [**Id.** at 26.] For the foregoing reasons. this Court properly granted DHS's petition to involuntarily terminate Father's parental rights pursuant to Section 2511(b).

Trial Ct. Op. at 12-13. After independent review of the record, we conclude the evidence supports the court's finding of sufficient grounds for termination under Subsection 2511(b).

For all the foregoing reasons, we decline to disturb the order terminating Father's parental rights.

## IV. Goal Change

We next review the trial court's order changing Child's goal to adoption. We note the relevant standard of review:

> [O]ur standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these

responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re A.K.*, 936 A.2d 528, 532-33 (Pa. Super. 2007) (citation omitted).

With respect to a goal change:

The best interests of the child, and not the interests of the parent, must guide the trial court. ["A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

*In re A.B.*, 19 A.3d 1084, 1089 (Pa. Super. 2011) (citations omitted).

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

\* \* \*

While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.K.*, 936 A.2d at 533 (citation omitted).

Section 6351(f) of the Juvenile Act[5] provides, in relevant part:

**(f) Matters to be determined at permanency hearing.—** At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

---

[5] 42 Pa.C.S. §§ 6301-6375.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\*   \*   \*

(8.2) That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C. § 675(5)(h)).

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child . . .

\*   \*   \*

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities.  In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

> > (ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S. § 6351(f).

We incorporate our above discussion concerning Father's failure, over four years, to maintain consistent visitation and to complete his plan objectives. At the time of the termination hearing, Child had been committed to DHS's care and placed in foster care for four years and three months — far longer than the 18-month period contemplated in *In re A.K. See In re A.K.*, 936 A.2d at 533. The record supports the goal change order, as Child's life "cannot be put on a hold in the hope that [Father] will summon the ability to handle the responsibilities of parenting." *See id.* Accordingly, we affirm the goal change order.

### IV. Conclusion

For the foregoing reasons, we agree with Counsel that the instant appeal is frivolous. We affirm the order involuntarily terminating Father's parental rights and the order changing the goal to adoption. We also grant Counsel's petition to withdraw.

Orders affirmed. Counsel's petition to withdraw from representation granted.

Judge Stabile joins the Memorandum.

Judge Dubow Did Not Participate.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2022